UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIEL GONZALES,<br><br>         Petitioner,<br><br>   v.<br><br>M. ELIOT SPEARMAN, Warden, High Desert State Prison,<br><br>         Respondent. | No. 1:16-cv-01224-AWI-SKO HC<br><br>**FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**<br><br>**(Doc. 17)** |

Petitioner, Gabriel Gonzales, is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner alleges seven grounds for habeas relief: (1) the trial court improperly refused to sever counts related to Petitioner's co-defendant; (2) the prosecutor improperly divulged Petitioner's juvenile court file; (3) jury instruction error; (4) insufficient evidence;[1] (5) the trial court improperly admitted text messages;[2] (6) the trial court improperly admitted gang expert testimony; (7) the trial court improperly imposed a sentence enhancement in violation of Petitioner's right to equal protection of the law. The Court referred

---

[1] Petitioner broke his insufficient evidence claim into three separate claims. The Court has combined them for clarity, but will address all three claims individually.

[2] Petitioner separated his claim that the trial court improperly admitted text messages into two separate claims. The Court combined them for clarity, but will address both of Petitioner's claims individually.

1

the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304. Having reviewed the record as a whole and applicable law, the undersigned recommends that the Court deny the habeas petition.

## I.    **Factual and Procedural Background**[3]

Petitioner and three co-defendants, Emmanuel Toscano ("Toscano"), Hilario Aguero ("Aguero"), and Fernando Garcia-Santos ("Garcia-Santos") were charged with and tried together before a jury for crimes that were committed over the course of two days, August 28, 2010 and April 30, 2011.[4] Only Aguero was charged with committing crimes on August 28, 2010. However, because Petitioner argued the trial court erred in not severing the charges from the August 28, 2010 crimes, the Court will detail the events of both days.

Ramzee Johnson ("Johnson"), an African American man in his mid-thirties, lived with his family in a predominately Hispanic neighborhood in northeast Bakersfield, California. At approximately 3:00 a.m. on August 28, 2010, Johnson left his apartment to walk to the market.

Shortly after leaving his apartment, Johnson saw Aguero and Francisco Castro ("Castro") standing about a block and a half away from him. When Aguero and Castro started walking towards him, Johnson became nervous and turned around to walk back to his apartment.

Aguero and Castro caught up to Johnson, stood in front of him, and started asking him "gang questions" like "where are you from?" and "where you at?" Johnson replied that he was "not from anywhere" and stated he lived on the street where they were standing and that they were in front of his residence.

---

[3] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Toscano et al.*, (F065808) (Cal. App. Aug. 27, 2015), is presumed to be correct. 28 U.S.C. § 2254(e)(1).
[4] Christian Albarran ("Albarran") was originally named as a defendant. However, Albarran entered a no contest plea prior to trial and did not otherwise participate directly in trial.

2

Castro pulled out a .25-caliber, semiautomatic firearm and Johnson heard a clicking sound, indicating the gun had been cocked.  Believing he was about to be killed, Johnson grabbed for the gun.  The gun fired as soon as he grabbed it, but the shot missed him.   Johnson twisted the gun out of Castro's hand and fired back at Castro.  Aguero and Castro fell to the ground and then quickly got up and ran away.  Johnson fired the gun in their direction several times until he heard a click and the gun appeared to be empty.  Johnson called 911 and the police arrived.

When the police arrived, individuals in front of a nearby residence yelled at the officers that their friends were inside, shot and bleeding.  Officers found Aguero and Castro inside the residence, both with gunshot wounds.

Aguero and Castro were transported to the hospital for treatment.  When a police officer returned to the hospital two days later to transport Aguero to jail for booking, the officer discovered that nursing staff had accidentally released him from custody.  The police could not locate Aguero prior to the events of April 30, 2011.

On April 30, 2011, Gerardo V. ("Gerardo") was fatally shot in a church parking lot in west Bakersfield, California.  The parking lot was located next to a restaurant where Gerardo and some of his high school friends were attending a quinceañera.

At trial, the prosecutor argued that the shooting was an act of gang-related retaliation for a shooting that occurred six days earlier on April 24, 2011.  On that day, the perpetrators shouted either "Westside" or "Southside" and shot at one of Petitioner's co-defendants, Toscano, and his brother, Jacob Toscano ("Jacob").  Jacob was injured.

Toscano told a deputy that responded to the scene that he and his brother were walking home from a 7-Eleven on April 24, 2011, when a car pulled up next to them.  Several African American males exited the car and shot at Toscano and his brother.  When the assailants shouted

"Southside," Toscano responded by "gangbanging back at them" and yelling "Hillside."[5]

In the days after the April 24, 2011 shooting, Melina M. ("Melina"), a 16-year-old who knew Toscano overheard Toscano talking about Jacob being shot. Toscano appeared very angry and she heard him say "something about the Westside."

On the afternoon of April 30, 2011, Melina saw Toscano and invited him to attend her friend's quinceañera. Petitioner's co-defendant, Aguero, was standing with Toscano at the time Melina invited Toscano. Toscano, Petitioner, and the other co-defendants showed up at the restaurant where the quinceañera was being held, and Melina went out to meet the men.

Melina became upset with Toscano when he started leading the others in his group in "pretending" to be members of the Westside Bakers gang. Melina knew Toscano was actually an "Eastsider" and member of the rival Loma Bakers gang. Toscano and his friends were shouting "Westside" and directing Westside hand signals towards other men at the quinceañera, who were socializing around the restaurant and in an adjacent minimarket. Toscano warned Melina in front of the others not to tell anyone that his group was from "the East." He also showed her that he was armed by lifting his shirt and exposing the handle of a firearm tucked inside his waistband.

Melina asked Toscano to leave and went back inside the restaurant. From inside the restaurant, she saw Petitioner and his three co-defendants leave. The men crossed in front of the restaurant and then headed towards the church parking lot. The murder victim, Gerardo, and three of his friends were in the church parking lot waiting to get into a car. Petitioner and his co-defendants surrounded Gerardo and his friends.

Led by Toscano, the group asked Gerardo and his friends where they were from. Gerardo's friends responded that "we don't bang." Maintaining the pretense that they were West Side Bakers, Toscano and his group started making derogatory comments about Eastsiders and asked Gerardo's

---

[5] "Hillside" refers to a sect of the Loma Bakers gang in the Hillside area of Bakersfield.

group where they could find some Eastsiders.

Eventually, both groups shook hands and Petitioner's group appeared to be preparing to leave. Gerardo and his friends got into their car, with Gerardo in the front passenger's seat. The front passenger-side door was still open, when Toscano said "Keep it Westside," to which Gerardo replied, "I'm Westside, too."

When Gerardo stated he was Westside, Petitioner came up to the car and asked Gerardo what he had said. Gerardo repeated that he was from the Westside too, Petitioner replied, "You're not from my hood," and challenged Gerardo to get out of the car and fight him.

Petitioner's co-defendants were saying things to "pump up" Petitioner, including: "Just fight him. Just fight him." Gerardo's friends told him to just be quiet and started the car up to leave; however, they could not drive away without hitting someone in Petitioner's group, who had all surrounded the car.

While recollections differed as to the details of events, Gerardo's group remembered seeing Petitioner reach into the car and grab Gerardo's cell phone from his hands or from his lap. As Petitioner grabbed the cell phone, someone heard him call Gerardo a "bitch" and say "give me your fucking phone."

Gerardo begged Petitioner to return his phone. Petitioner responded by saying something to the effect that he would return Gerardo's phone, but first Gerardo would have to get out of the car and fight him. Petitioner's group continued to challenge Gerardo to get out of the car and fight with Petitioner.

Remaining inside the car, Gerardo continued imploring Petitioner to return his cell phone and repeating that he did not want to fight Petitioner. Gerardo also expressed some confusion, asking Petitioner why they were supposed to be fighting when they were from the "same hood."

5

Petitioner reached into the car again and grabbed Gerardo's hat from off his head. Gerardo told Petitioner to keep the hat, but given him back his phone. Gerardo finally closed his door and said, "I'm going to call the big [homeys]."

Toscano walked back up to the car and opened Gerardo's door. Toscano then pulled out the gun and shot Gerardo. After shooting Gerardo, Petitioner and his group ran away together towards a nearby alley, shouting something as they ran. Meanwhile, Gerardo got out of the car and started running toward the restaurant. Gerardo collapsed outside the restaurant and died shortly thereafter from the gunshot wound to his left shoulder.

The pathologist who performed the autopsy explained that Gerardo suffered extensive blood loss due to the laceration of vital organs, including a major vein in his hear and the upper lobes of both his lungs.

At trial, Kern County Sheriff's Deputy Richard Hudson ("Hudson") testified as a gang expert for the prosecution. Hudson opined that, at the time of their offenses, Petitioner and his co-defendants were all members of, and active participants in, the Loma Bakers criminal street gang.

Presented with hypotheticals based on the August 2010 and April 2011 incidents underlying the charged offenses, Hudson opined the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. With respect to the gang-benefit of the April 2011 offenses, Hudson opined that the scenario presented was an act of retaliation and explained:

> When an individual is put in a situation where a gang is going to require retaliation, when they conduct that retaliation they're going to create status, fear within the neighborhood, because this incident will be talked about. It will be discussed. People will hear about it in schools. They'll hear about it in the neighborhood. It will get around.
>
> So the information will get out to other gangs, as well as the neighborhood, that these individuals, when disrespected, will, in this case, kill you, and by doing that they're going to limit the amount that people will be willing testify; that other gang members will be willing to come to their neighborhood and disrespect them.

Regarding his opinion that the offenses were committed in association with a criminal street gang, Hudson specifically testified:

> Based on the hypothetical, all the members acted together to accomplish a goal. They traveled together to rival territory. They all pretended to be Westside together. They all took part in that. They attempted to identify – through the hypothetical attempted to identify rivals. Once they did they all acted together by moving as a group from one point to another to confront those individuals that they perceived to be rivals. They also confronted them by both words, surrounding, and then this violence escalated tougher as they continued to support each other. And then when the cell phone and hat was taken, while the others were present, they continued to be verbally and physically supportive and backing that individual, continuing to say different statements. And then the mere numbers of surrounding is an intimidation. And then during the shooting all the other individuals were still present by the shooter and they all fled together.

Harlan Hunter ("Hunter"), a private investigator, testified as a gang expert on behalf of Petitioner. Hunter opined that on April 30, 2011, Petitioner was not a member of, or an active participant in, the Loma Bakers criminal street gang.

Assuming the same hypothetical facts based on the April 2011 incident, as those addressed by the prosecution's gang expert, Hunter opined that the shooting was a "personal incident" and was

> not done for the benefit of a gang, but . . . was actually done for the benefit of the shooter, who basically had come there already upset about a previous shooting of his brother, and at that particular time decided that he was going to shoot the victim.

Harlan further opined:

> [T]here's nothing in that hypothetical that supports any notion, idea, [or] knowledge that the other parties who were with the shooter had knowledge that the shooter was going to shoot the victim. . . .

> And so again, it's my opinion on that particular day that this was not done for the benefit and in association with these other individuals, but done by an individual who basically was angered by this threat of don't make me get my big homeys, which is akin to don't make me go get my friends and come back and deal with you, became upset and shot the victim.

7

At trial, the court gave a jury instruction regarding aiding and abetting that is relevant to the case at bar. As read to the jury, CALCRIM No. 400 stated:

> A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.

On April 11, Petitioner was convicted of first degree premeditated murder, with robbery and gang special circumstance findings (Cal. Penal Code §§ 187, 189, 190.2(a)(17), (22)); second degree robbery (Cal. Penal Code § 211); shooting at an occupied motor vehicle (Cal. Penal Code § 246); and active participation in a criminal street gang (Cal. Penal Code § 186.22(a)). With regard to the murder, robbery, and shooting into an occupied vehicle counts, the jury found true the allegations that a principal discharged a firearm during the crime causing death. (Cal. Penal Code §§ 12022.53(d), (e)(1)). Petitioner was sentenced to life without the possibility of parole, plus twenty-five years to life.

On August 27, 2015, the Court of Appeal for the Fifth Appellate District ("Court of Appeal") affirmed Petitioner's conviction.[6] On November 24, 2015, the California Supreme Court denied review.

On January 9, 2017, Petitioner filed a first amended petition for writ of habeas corpus before this Court. Respondent filed a response on May 17, 2017 and Petitioner filed a reply on July 24, 2017.

---

[6] On September 15, 2015, the Court of Appeal filed a modified opinion to correct an error in the original opinion, but did not change the judgment.

8

## II.    <u>Standard of Review</u>

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States."  *Lockyer*, 538 U.S. at 71.  In doing so, the Court must look to the holdings, as opposed to the dicta, of the

9

Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

### III.     The State Court Did Not Err in Rejecting Petitioner's Motion to Sever Claims

In his first ground for habeas relief, Petitioner contends the trial court erred when it denied his motion to sever the counts against co-defendant Aguero that related to the August 28, 2010 shooting, from his counts related to the April 30, 2011 shooting. (Doc. 17 at 25.) Petitioner admits that joining the counts met "the legal requirements of joinder[; however], the joinder was highly prejudicial," because it was only based on "gang allegations." *Id.* (citing *People v. Miller*, 50 Cal. 3d 954, 987 (1990); *People v. Stitely*, 35 Cal. 4th 514, 531 (2005)). Respondent counters "the

United States Supreme Court has never clearly held that improper joinder of charges violates the Constitution," and the state court's rejection of the claim was not contrary to clearly established Supreme Court law.  (Doc. 23 at 27.)

## A. **State Court of Appeal Opinion**

The Court of Appeal rejected Petitioner's claim, finding:

> [Petitioner] concedes the offenses in this case were of the same class, and, therefore their joinder was permissible under the applicable statute.  (§ 945 [two or more offenses of same class may be joined in accusatory pleading]; *People v. Ochoa* (2001) 26 Cal.4th 398, 423; *People v. Bradford* (1997) 15 Cal.4th 1229, 1315; *People v. Arias* (1996) 13 Cal.4th 92, 126 (*Arias*) ["[w]hen exercising its discretion, the court must balance the potential prejudice of joinder against the state's strong interest in the efficiency of a joint trial"].)  Because the statutory requirements for joinder were met, we may reverse only if a clear showing of resulting prejudice has been made.  (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 447 (*Williams*).)

> In *Williams*, *supra*, 36 Cal.3d 441, our Supreme Court stated several factors to be considered in deciding whether charges should be severed: (1) the lack of cross-admissibility of evidence; (2) the prejudicial effect of joining one charge with a more inflammatory charge; (3) the prejudicial effect of joining a weak case with a strong case; and (4) whether the People sought to join a charge with a capital offense.  (*Id*. at p. 453.)  [Petitioner's] challenge focuses on the first two factors.

> With respect to the first factor, the trial court in this case observed that the joined charges shared common elements "at least with respect to the gang allegations."  Consequently, the court found cross-admissibility of evidence "as to the testimony of the gang expert, who . . . outline[d] the defendants' gang contacts with law enforcement in order to give opinions in this case."

> Relying heavily on *Williams*, *supra*, 36 Cal.3d 441, where joinder was found to be improper, [Petitioner] suggest the trial court erred in finding the gang evidence cross-admissible.  In Williams, the court concluded that just because the two murders were gang related did not render the gang evidence cross-admissible under [California] Evidence Code section 1101.  (*Williams*, at p. 450.)

> However, *Williams*, *supra*, 36 Cal.3d 1441, was a capital case, where "it is the joinder *itself* which gives rise to the special circumstances allegation of multiple murder."  (*Id*. at p. 454.)  Therefore, "the court [had to] analyze the severance issue with a higher degree of scrutiny and care than is normally applied in a noncapital case."  (*Ibid*.)  *Williams* also predated section 186.22, so its treatment of gang evidence is inapposite.  Unlike in *Williams*, the relevant gang evidence here was clearly cross-admissible to prove the gang-related charges and special allegations in both cases (§§ 186.22, subds. (a), (b)(1), 190.2, subd. (a)(22), 12022.53, (subd. (e)(1)).

11

In any event, the issue of whether the evidence relevant to the joined charges was cross-admissible is not determinative. (§ 954.1 [evidence need not be cross-admissible before jointly charged offenses may be tried together]; Arias, *supra*, 13 Cal.4th at pp. 126-127; *People v. Marquez* (1992) 1 Cal.4th 553, 572-573 [the clear prejudice has not been shown in this case. (*People v. Marquez*, *supra*, at p. 572 [the burden is on the defendant to show prejudice].)

[Petitioner's] reliance on *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933 is misplaced because the facts of that case are completely different than the facts here. There, an attempted murder charge against Calderon and a codefendant was joined with an "execution-style" murder charge against the codefendant and another man. The appellate court found that the trial court abused its discretion in consolidating the cases because, with one exception, none of the evidence related to the "execution-style" murder was admissible against Calderon, the "execution-style" murder was likely to inflame the jury, and the evidence against Calderon was weak but the evidence against his codefendant was strong. (*Id*. at pp. 939-941.)

Notwithstanding [Petitioner's] assertions to the contrary, there was nothing particularly inflammatory about the joined charges. It certainly cannot be said that the evidence of Aguero's August 2010 crimes – which ended with the uninjured, adult victim successfully grabbing his assailants' weapon and firing it on them as they fled – was likely to inflame the jury unduly with regard to [Petitioner's] and the other appellants' April 2011 crimes, which ended with the fatal shooting of an unarmed, 16-year-old high school student as he was sitting in his friend's car in a church parking lot.

(Lodged Doc. 13 at 11-14.)

**B. The State Court Did Not Err in Rejecting Petitioner's Motion to Sever Claims**

To the extent Petitioner's claim involves the trial court's misapplication of California's laws regarding severance, the claim is not cognizable on federal habeas review, because it involves only an alleged error in state law. "It is not the province of a federal court to reexamine state court determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Habeas relief is not available for an alleged error in the application of state law. *Id*. at 68.

Petitioner's federal due process challenge to the trial court's refusal to sever these claims also fails, because the United States Supreme Court "has not held that a state or federal trial court's denial of a motion to sever can" violate constitutional rights. *Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1899 (2014). Indeed, the Supreme Court has

held that "[i]mproper joinder does not, in itself, violate the Constitution." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986).

However, the Supreme Court has stated that "misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id*. The Ninth Circuit has held this statement from *Lane* is only dicta. *Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010). Consequently, *Lane* does not set forth a governing legal principle, and does not constitute clearly established federal law, with regard to when severance is constitutionally mandated. *Id*.; *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006) (restricting "clearly established federal law" under § 2254 to holdings of the Supreme Court, rather than dicta). For these reasons, the Court of Appeal's rejection of Petitioner's severance claim could not have been an unreasonable application of clearly established federal law.

Prior to *Collins*, the Ninth Circuit held undue prejudice from misjoinder existed only "if the permissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000). "In evaluating prejudice, the Ninth Circuit focuses particularly on cross-admissibility of evidence and the danger of 'spillover' from one charge to another, especially where one charge or set of charges is weaker than another." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). The risk of prejudice increases "whenever joinder of counts allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible." *Sandoval*, 241 F.3d at 772.

Here, the Court of Appeal reasonably concluded that Petitioner suffered no prejudice from the trial's court decision not to sever the counts against Aguero from counts against Petitioner. As the Court explained, the testimony of the gang expert, who described "the defendants' gang contacts with law enforcement," was cross-admissible. (Lodged Doc. 13 at 12.) Specifically, evidence from either crime would have been admissible in both cases to show that the defendants were active

participants in a criminal street gang, the crimes were carried out to further the activities of the gang, and to show the crimes were committed for the benefit of, at the direction of, or in association with the gang.

The Ninth Circuit was also concerned that joinder would allow a weak case to join a strong one. However, the case against Petitioner was not weak. Eyewitnesses and videotape established Petitioner's involvement in the murder of Gerardo. This evidence was sufficient to support the charges, even without the evidence from the April 30, 2001 incident.

Finally, the jury was instructed to consider the evidence as applied to each defendant separately and decide each individual charge for each defendant separately, pursuant to CALCRIM No. 203.[7] (Clerk's Transcript Vol. 8 at 2295). Based on the foregoing, the Court recommends finding that the Court of Appeal's rejection of Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Consequently, federal habeas relief is not warranted on this claim.

**IV.    The Trial Court Did Not Err in Rejecting the Claimed Violation of California Welfare and Institutions Code § 827**

In his second ground for habeas relief, Petitioner alleges the prosecutor violated California Welfare and Institutions Code § 827 ("§ 827") by improperly revealing Petitioner's juvenile court file. (Doc. 17 at 27.) Section 827(a)(1) provides, "a case file may be inspected only by the following: (E) The attorneys for the parties, judges, referees, other hearing officers, probation officers, and law enforcement officers who are actively participating in criminal or juvenile proceedings involving the minor."

The prosecutor obtained juvenile reports from a search of Petitioner's residence and gave the reports to counsel for Petitioner's co-defendants and Hudson, the gang expert. *Id.* At trial,

---

[7] Pursuant to CALCRIM No. 203, the jury was instructed, in part: "You must separately consider the evidence as it applies to each defendant. You must decide each charge for each defendant separately."

Petitioner moved to exclude the reports, arguing the prosecutor failed to obtain permission from the juvenile court to distribute them. *Id.* Respondent counters that the United States Supreme Court has never held there is a right of privacy for juvenile records; therefore, the Court of Appeal's decision is not contrary to clearly established Supreme Court precedent. (Doc. 23 at 32-33.)

**A. State Court of Appeal Opinion**

The Court of Appeal denied Petitioner's claim, holding:

During in limine proceedings, [Petitioner] objected to the admission of evidence concerning juvenile probation searches conducted on him and his brother in 2008 and 2010, which uncovered evidence of their mutual gang membership. [Petitioner] objected on the ground the details of the probation searches came from juvenile probation reports, which were part of his confidential juvenile court case file and which were unlawfully disseminated by the prosecutor to Deputy Hudson, the prosecution's gang expert, and appellants' trial attorneys without first petitioning for a juvenile court order as required by Welfare and Institution Code section 827 (hereafter, section 827).

Section 827, subdivision (a)(1) provides, in relevant part:

"[A juvenile] case file may be inspected only by the following: [¶] . . . [¶] (B) The district attorney . . . [¶] . . . [¶] (E) The attorneys for the parties, judges, . . . and law enforcement officers who are actively participating in criminal or juvenile proceedings involving the minor. [¶] . . . [¶] (P) Any other person who may be designated by court order of the judge of the juvenile court upon filing a petition."

In overruling [Petitioner's] objections, the trial court found, *inter alia*, that no violation of section 827 occurred because the prosecutor undisputedly obtained copies of the probation reports directly from the sheriff's department, not from [Petitioner's] juvenile court case file. On appeal, [Petitioner] argues this was error because a juvenile probation report falls "within the [statutory] definition of 'a juvenile case file.'" FN4 Therefore, [Petitioner] contends, even though the prosecutor was entitled to inspect his juvenile case file on her own without a juvenile court order under subdivision (a)(1)(B) of section [827],[8] subdivision (a)(1)(P) of the statute required her to petition the juvenile court for an order before disseminating copies of the contents of his case file to Hudson and other attorneys in the case.

---

[8] The Court of Appeal appears to have made a clerical error in the opinion as the opinion cites to section 387, instead of section 827. Section 387 of the California Welfare and Institutions Code governs "Dependent Children – Modification of Juvenile Court Judgments and Order."

15

FN4 [Petitioner] relies on section 827, subdivision (e), which provides: "For purposes of this section, *a 'juvenile case file' means* a petition filed in any juvenile court proceeding, *reports of the probation officer*, and all other documents filed in that case or made available to the probation officer in making his or her report, or to the judge, referee, or other hearing officer, and thereafter retained by the probation officer, judge, referee, or other hearing officer." (Italics added.)

Assuming *arguendo* the trial court erred in finding the juvenile probation reports were not subject to section 827, we agree with the People that the trial court correctly concluded no violation of the statute occurred because, contrary to [Petitioner's] assertions, none of the persons with whom the prosecutor shared copies of his probation reports was required to petition the juvenile court for an order before inspecting his juvenile court case file. [Petitioner] interprets the reference to *the minor* in section 827, subdivision (a)(1)(E), to mean the gang expert and trial attorneys involved in the instant proceedings would be entitled to inspect his juvenile court case file without a court order but only if he were still *a minor*. Because he was not a minor, [Petitioner] asserts section 827 subdivision (a)(1)(P) was applicable and they were required to petition the juvenile court for an order to inspect his juvenile court case file and the prosecutor could not lawfully circumvent this requirement by providing them with copies of his juvenile probation reports she obtained from the sheriff's department.

[Petitioner's] interpretation of section 827, subdivision (a)(1)(E), as creating different requirements depending on the current age of the person whose juvenile case file is at issue, is unpersuasive and unsupported by the plain language of the statute. Upon reaching adulthood, [Petitioner] did not cease being the person designated as *the minor* in his juvenile court case records. Because appellants' trial counsel and the prosecution's gang expert were "actively participating in *criminal . . . proceedings* involving the minor [i.e., [Petitioner]]" they were statutorily entitled to inspect his juvenile court case file without first obtaining a juvenile court order. It cannot be said, therefore, that the prosecutor violated section 827 by providing them with copies of records they were already permitted to inspect on their own without a court order.

(Lodged Doc. 13 at 14-16.)

### B.  The State Court Did Not Err in Allowing the Distribution of Petitioner's Juvenile File

To the extent Petitioner's claim involves the trial court's violation of § 827, the claim is not cognizable on federal habeas review because it involves only an alleged error in state law. *Estelle*, 502 U.S. at 71-72 ("It is not the province of a federal court to reexamine state court determinations of state law questions."). Here, the Court of Appeal held the trial court "correctly concluded no

violation of the statute occurred because . . . none of the persons with whom the prosecutor shared copies of [Petitioner's] probation reports was required to petition the juvenile court for an order before inspecting" the file. (Lodged Doc. 13 at 15-16.) This Court will not reexamine the accuracy of the state court's analysis of state law. *Estelle*, 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Langford v. Day*, 110 F.3d 1380, 1389 1389 (9th Cir. 1997) ("We accept a state court's interpretation of state law, . . . and alleged errors in the application of state law are not cognizable in federal habeas corpus.").

Petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford*, 110 F.3d at 1389 (citing *Melugin v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994)). Here, Petitioner alleges his "federal due process right to a fair trial and to procedural due process" were violated. (Doc. 17 at 30) (citing U.S. Const. amend. V, XIV; *Estelle*, 502 U.S. at 73; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976); however, case law Petitioner cites does not support his due process claim. *See Donnelly*, 416 U.S. at 643 ("When specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes on them."); *Matthews*, 424 U.S. at 333 ("This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest."). Petitioner has not cited any federal authority to support a due process right to privacy for juvenile court records.

Section 827 establishes a right to confidentiality of juvenile records under state law, but there is no corresponding federal due process right. *Rigsby v. Cty. of Los Angeles*, Civ. No. 11-02766, 2011 WL 13143544, at *3 (E.D. Cal., Aug. 2, 2011), aff'd 531 F. App'x 811 (9th Cir. 2011) ("There is no 'right of privacy' for juvenile records expressly guaranteed by the United States Constitution."); *Maldonado v. Sec'y of California Dep't of Corrs. & Rehab.*, Civ. No. 06-2696,

2007 WL 4249811, at *5 (E.D. Cal. Nov. 30, 2007) (Section 827 "could not purport to bind the federal courts. . . . [C]omity required that the state law be respected if at all possible. . . ."). Because there is no clearly established Supreme Court precedent, the Court of Appeal's decision was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to habeas relief and the Court recommends denying Petitioner's claim.

## V.    A Jury Instruction Error Does Not Present Cognizable Federal Claim

In his third ground for habeas relief, Petitioner alleges that CALCRIM No. 400,[9] the jury instruction on aiding and abetting, incorrectly instructed the jury on aiding and abetting. (Doc. 17 at 30.) Petitioner contends the instruction was "misleading because it [incorrectly] told the jury an aider and abettor is 'equally guilty' with the principal." *Id*. Respondent counters that this claim is procedurally defaulted, because the Court of Appeal found the claim was forfeited due to Petitioner's failure to object to the instruction during the trial. (Doc. 23 at 36-37.) Respondent also argues that the Court of Appeal's decision was not an unreasonable factual determination and did not contravene clearly established federal precedent. *Id*. at 37.

### A.  Standard of Review for Alleged Errors in Jury Instructions

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules")). A petitioner may not

---

[9] As read to the jury, CALCRIM No. 400 provides:

> A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.

"transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford*, 110 F.3d at 1389 (citing *Melugin v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994)).

To prevail on a collateral attack of state court jury instructions, a petitioner must do more that prove that the instruction was erroneous. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Instead, the petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72 (internal citations omitted). Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

A federal court's review of a claim of instructional error is highly deferential. *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993). A reviewing court may not judge the instruction in isolation but must consider the context of the entire record and of the instructions as a whole. *Id.* The mere possibility of a different verdict is too speculative to justify a finding of constitutional error. *Henderson*, 431 U.S. at 157. "Where the jury verdict is complete, but based upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict unless there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (quoting *Estelle*, 502 U.S. at 72) (internal quotation marks omitted).

If a trial court has made an error in an instruction, a habeas petitioner is only entitled to relief if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776) (internal quotation marks omitted). A state prisoner is not entitled to federal habeas relief unless the instructional error resulted in "actual prejudice." *Id.* A violation of due process occurs only when the instructional error results in the trial being fundamentally unfair. *Estelle*, 502 U.S. at 72-73; *Duckett v. Godinez*,

67 F.3d 734, 746 (9th Cir. 1995). If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

### B. State Court of Appeal Opinion

The Court of Appeal denied Petitioner's claim, holding that he forfeited the claim because he failed to object to the instruction at trial. In the alternative, the Court of Appeal found any mistake in the instruction harmless.

> Prior to 2010, CALCRIM No. 400, defining the general principles of aiding and abetting, advised that a person is "equally guilty" of a crime whether he or she committed the crime personally or aided and abetted the perpetrator. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165 (*Samaniego*), citing former CALCRIM No. 400 (2009 rev.).) The "equally guilty" language has since been removed from the instruction. (See CALCRIM No. 400 ["A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator"].) Although the proceedings below were conducted in 2012, the jury was instructed pursuant to an outdated version of CALCRIM No. 400. Aguero, Garcia-Santos, and [Petitioner] allege instructional error based on the "equally guilty" language that was used in the trial court's explanation of the law concerning accomplice liability. FN10
>
> > FN10 "The relevant text of the instruction read: 'A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator.'"
>
> None of the appellants objected to, nor requested modification or clarification of, the challenged instruction. This failure to act should be fatal to their claim since there are several published opinions which hold that a challenge to the "equally guilty" language in former versions of CALCRIM No. 400 is forfeited by a failure to object and/or request clarifying language at the time of trial. (*E.g., People v. Mejia* (2012) 211 Cal.App.4th 586, 624 [addressing challenge to the "equally guilty" language in CALJIC No. 3.00]; *People v. Lopez* (2011) 198 Cal.App.4th 788, 809]; *Samaniego, supra*, 172 Cal.App.4th at p. 1163.). Forfeiture aside, we find the alleged error to be harmless under any standard of prejudice.
>
> The challenged version of CALCRIM No. 400 did not contain an incorrect statement of law. "All principals, including aiders and abettors, are 'equally guilty' in the sense that they are criminally liable." (*People v. Bryant*, *Smith* and *Wheeler* (2014) 60 Cal.4th 335, 433; accord, § 31 ["All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed"].) Nevertheless, a number of appellate decisions hold that under extraordinary circumstances, the aider and abettor may have a mental state which reflects a lesser

level of culpability than that of the direct perpetrator. (See, e.g., *Samaniego*, *supra*, 172 Cal.App.4th at pp. 1164-1165 ["while generally correct in all but the most exceptional circumstances, [CALCRIM No. 400] is misleading here and should have been modified"].)

According to the California Supreme Court, it is possible for an aider and abettor to be convicted of a crime greater than the offense for which the actual perpetrator is liable. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118-1119, 1122.) In light of this holding, appellate courts have reasoned that the opposite must be true, i.e., an aider and abettor can theoretically be convicted of a lesser crime than the offense for which the actual perpetrator is liable. (*Lopez*, *supra*, at p. 1118; *Nero*, *supra*, 181 Cal.App.4th at pp. 513-518; *Samaniego*, *supra*, 172 Cal.App.4th at pp. 1163-1164.) Given these possible outcomes, the "equally guilty" language is potentially misleading insofar as it suggests that the direct perpetrator and the aider and abettor must be found guilty, if at all, of the same crime(s) and degree(s) thereof. However, reversible error stemming from the use of this language has only been found in cases where jurors informed the trial court that they were confused by the instruction, and the court failed to provide adequate clarification in response to their inquiries on the subject. (*People v. Loza* (2012) 207 Cal.App.4th 332, 352-355 (*Loza*); Nero, *supra*, 181 Cal.App.4th at pp. 517-520.)

We do not presume a jury has been misled by an erroneous instruction. To the contrary, "[a] defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) Otherwise, we adhere to the presumption that jurors are "able to understand and correlate instructions," and follow the instructions that they are given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) This presumption was rebutted in *Loza* and *Nero*, *supra*, through evidence which clearly showed that the jurors were confused as to what mental state was required to establish aider and abettor liability. (*Loza*, *supra*, 207 Cal.App.4th at p. 355 ["the questions this jury asked indicated that despite having been provided instructions from which they should have understood that they were required to consider the intent of the person accused of aiding and abetting the perpetrator the jury remained confused as to this issue"]; *Nero*, *supra*, 181 Cal.App.4th at p. 518 ["where, as here, the jury asks the specific question whether an aider and abettor may be guilty of a lesser offense, the proper answer is 'yes,' she can be. The trial court, however, by twice rereading CALJIC No. 3.00 [containing the 'equally guilty' language] in response to the jury's questions, misinstructed the jury"].) Here, in contrast, the record is devoid of any indication that the jury was confused by the aiding and abetting instructions.

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) A jury instruction is not judged in artificial isolation, but rather from the entire charge of the court and the overall trial record. (*People v. Solomon* (2010) 49 Cal.4th 792, 822; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1330-1331.) In this case, the instruction given under CALCRIM No. 400 was immediately followed by a more detailed

explanation of the required mens rea for aiding and abetting liability as set forth in CALCRIM No. 401.  FN11

> FN11 CALCRIM No. 401 instructed the jury: "To prove that defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.  [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.  [¶] If all of these requirements are proved, the defendant does not need to have actually been present when the crime was committed to be guilty as an aider and abettor.  [¶] If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.  [¶] A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. . . ."

Considering that the jury was properly instructed under CALCRIM No. 401 and expressed no confusion regarding the "equally guilty" language in CALCRIM No. 400, we are not persuaded that a miscarriage of justice occurred through the use of the latter instruction.  (See *Lopez*, *supra*, 198 Cal.App.4th at pp. 1119-1120 [any error in CALCRIM No. 400's "equally guilty" language was harmless where jury was also instructed with CALCRIM No. 401].)  The entirety of the instructions properly informed the jury as to the intent required for aider and abettor culpability. We thus conclude that the conclusion of the phase, "equally guilty" in CALCRIM No. 400 did not constitute reversible error.

(Lodged Doc. 13 at 35-39.)

## C.  The Court Did Not Err in Instructing the Jury on Aiding and Abetting

A federal court cannot review claims in a petition for writ of habeas corpus if a state court denied relief on the claims based on state law procedural grounds that are independent of federal law and adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements."  *Park v. California*, 202 F.3d 1146,

22

1150 (2000).

A petitioner procedurally defaults his claim if he fails to comply with a state procedural rule or fails to raise his claim at the state level. *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003) (citing *O'Sullivan v. Boerckel*, 562 U.S. 838, 844-45 (1999)). The procedural default doctrine applies when a state court determination of default is based in state law that is both adequate to support he judgment and independent of federal law. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). An adequate rule is one that is "firmly established and regularly followed." *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)); *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003). An independent rule is one that is not "interwoven with federal law." *Park*, 202 F.3d 1146 at 1152 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

When a state prisoner has defaulted on his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred, unless the prisoner can demonstrate cause for the default and actual prejudice as a result of an alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.[10]

In California, "an appellate court will not consider a claim of error if an objection could have been, but was not, made in the lower court." *People v. French*, 43 Cal. 4th 36, 46 (2008) (citing *People v. Saunders*, 5 Cal. 4th 580, 589-90 (1993)). The rule is in place because "[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided." *Id.* (quoting *People v. Vera*, 15 Cal. 4th 269, 276 (1997) (internal quotation marks omitted)). This forfeiture rule applies to a Petitioner

---

[10] In this case, the state court found the jury instruction claim was procedurally barred, but also, in the alternative, adjudicated the claim on the merits. The procedural bar stands regardless of the Court's decision to also adjudicate the claim on the merits. *See Harris*, 489 U.S. 255, 264 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

who fails to object to a jury instruction. *People v. Virgil*, 51 Cal. 4th 1210, 1260 (2011) "Defendant's failure to object to the instruction below . . . forfeits the claim on appeal."). Indeed, in this case, the Court of Appeal noted published opinions that held "a challenge to the 'equally guilty' language in former versions of CALCRIM No. 400 is forfeited by a failure to object and/or request clarifying language at the time of trial." (Lodged Doc. 13 at 36) (internal citations omitted).

The Ninth Circuit has held that California's contemporaneous objections doctrine is clear-well-established, and has been consistently applied. *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002.) This bar is independent and adequate, and applied consistently by California courts; therefore, Petitioner's claim is procedurally barred. *Vansickel v. White*, 166 F.3d 953 (9th Cir. 1999).

The Court of Appeal found an independent and adequate state procedural ground. Therefore, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Petitioner does not argue "cause for the procedural default," but instead argues there was actual prejudice. Petitioner states he was prejudiced by the instruction "because there was evidence [Petitioner] was not guilty of the same crime as co-[defendant] Toscano." (Doc. 17 at 31.) To show prejudice, a petitioner "must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis in original).

//

//

//

24

1

2      Here, the Court of Appeal determined that Petitioner was not prejudiced by the "equally

3  guilty" language in CALCRIM No. 400, because "[t]he challenged version of CALCRIM No. 400

4  did not contain an incorrect statement of law." (Lodged Doc. 13 at 36.) The California Supreme

5  Court has found the "equally guilty" phrase to be accurate "in all but the most exceptional

6  circumstances." *See, e.g., People v. Samaniego*, 172 Cal. App. 4th 1148, 1164-65 (2009) ("[A]n

7  aider and abettor could be guilty of a greater offense than the direct perpetrator, . . . [thus] an aider

8  and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable

9  mental state. Consequently CALCRIM No. 400's direction that 'a person is *equally guilty* of the

10  crime . . .," while generally correct in all but the most exceptional circumstances, [can be]

11  misleading.") (internal citations and quotation marks omitted) (emphasis in original); *People v.*

12  *Nero*, 181 Cal. App. 4th 504, 517-18 (2010).

13      The Court of Appeal noted that "reversible error stemming from" this language has only

14  been found where "jurors informed the trial court that they were confused by the instruction, and

15  the court failed to provide adequate clarification in response to their inquiries on the subject."

16  (Lodged Doc. 13 at 37) (internal citations omitted). That is not the case here, as the jury did not

17  have questions about the instruction, and the jury is presumed to follow the instructions they are

18  given. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

19      For the Court to grant habeas relief based upon an error in a jury instruction, there must be

20  a "reasonable likelihood" the jury applied the instruction in a way that violated the Constitution.

21  *Solis*, 219 F.3d at 927 (quoting *Estelle*, 502 U.S. at 72). The instruction may not be construed in

22  isolation, but rather, in the context of all the other jury instructions and the trial record as a whole.

23  *Estelle*, 502 U.S. at 72. The Court of Appeal found that considering all of the instructions given to

24  the jury, including CALCRIM No. 401, the jury was "properly informed . . . as to the intent required

25

for aider and abettor culpability." (Lodged Doc. 13 at 39.) Based on the foregoing, Petitioner is unable to show there was a "reasonably likelihood" the jury misapplied the instruction. Therefore, the Court recommends denying the claim.

## VI.     The State Court Did Not Err in Denying Petitioner's Insufficient Evidence Claim

In his fourth ground for habeas relief, Petitioner alleges there was insufficient evidence to convict him of robbery and first degree murder. Specifically, Petitioner alleges there was insufficient evidence to support: (1) the force or fear element of the robbery conviction and robbery-murder special circumstance finding; (2) the jury's finding of guilt on the substantive gang crimes and true findings on the gang special circumstances allegations and the gang enhancement; and (3) first degree murder conviction. Respondent counters that the Court of Appeal's rejection of Petitioner's claims was reasonable because there was evidence to support the jury's findings.

### A.     Standard of Review for Insufficient Evidence Claims

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998). It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

After AEDPA, a federal habeas court must apply the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The United States Supreme Court has explained the highly deferential standard of review in habeas

proceedings, noting that *Jackson*

> makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

*Cavazos v. Smith*, 565 U.S. 1, 3-4 (2011).

## B. Force or Fear Element of Robbery Conviction and Robbery-Murder Special Circumstance Finding

In Petitioner's first insufficient evidence claim, he contends there was insufficient evidence to convict him of second degree robbery and the robbery-murder special circumstance. (Lodged Doc. 13 at 32.) He alleges there was insufficient evidence that Gerardo's hat and phone were taken by force or fear or that it was done with the intent to permanently deprive Gerardo of his property. *Id*. at 32-34.

### 1. State Court of Appeal Opinion

The Court of Appeal rejected Petitioner's claim:

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Thus, the elements of robbery are: (1) the taking of personal property (2) from a person or the person's immediate presence (3) by means of force of fear, (4) with the intent to permanently deprive the person of the property. (*Ibid*.; *People v. Marshall* (1997) 15 Cal.4th 1, 34.) Appellants contend the evidence was insufficient to establish the third or fourth elements of robbery.

With respect to the third element appellants assert that [Petitioner's] simple act of reaching inside the car and grabbing or snatching Gerardo's cell phone and hat was insufficient to prove [Petitioner] accomplished the taking of Gerardo's property by means of force or fear. However, "the requisite force or fear need not occur at the time of the initial taking. The use of force or fear to escape or *otherwise retain even temporary possession of property* constitutes robbery." (*People v. Flynn* (2000) 77

27

Cal.App.4th 766, 771-772, italics added.)

Even assuming the requisite force or fear did not occur at the time of the initial taking, the record discloses substantial evidence that [Petitioner] used force or fear to *retain* possession of Gerardo's property and therefore the evidence was sufficient to satisfy the third element of robbery. It is evident from the record that Gerardo dearly wished to recover possession of his cell phone and the jury here could have wished to recover possession of his cell phone and the jury here could have reasonably inferred from all the circumstances that he would have attempted to reclaim his phone but fear prevented him from doing so. Gerardo's fear was evident his obvious reluctance to leave the shelter of Francis's car to try to reclaim his phone, and the evidence supports a reasonable inference that [Petitioner] and the other appellants intentionally engaged in intimidating behavior to instill fear in Gerardo to help [Petitioner] retain possession of, and eventually carry away after the shooting, the items he initially snatched away from Gerardo. Such behavior included standing together in close proximity to the car and encouraging and participating in [Petitioner's] continuing challenges to the victim to get out of the car and fight.

We likewise conclude there was sufficient circumstantial evidence from which the jury could reasonably infer that [Petitioner] intended to permanently deprive Gerardo of his property and thus satisfy the fourth element of robbery. It is well established that the intent with which a person acts is rarely susceptive of direct proof and usually is inferred from the factual circumstances of the offense. (Former § 21, subd. (a), § 29.2; *People v. Massie* (2006) 142 Cal.App.4th 365, 371.) Although out of the car to fight him, the jury was not required to credit, and could have reasonably doubted the sincerity of, [Petitioner's] statements, especially in light of members of a rival gang) to target the victim, and conclude that [Petitioner] intended to deprive the victim permanently of his property whether or not he succeeded in luring the victim out of the car.

(Lodged Doc. 17-18.)

### 2. Denial of Petitioner's Insufficient Evidence of Robbery Claim Was Not Objectively Unreasonable

Petitioner presents the same argument before this Court as before the Court of Appeal and is asking this Court to reweigh the evidence in his favor. However, on habeas review, this Court does not reweigh the evidence presented at trial. Instead, the Court must review the record to determine whether a rational trier of fact could have found Petitioner took Gerardo's hat and phone with force or fear and that it was done with the intent to permanently deprive Gerardo of his property.

The Court of Appeal set forth the statute defining robbery and determined that the evidence satisfied each element, principally the third and fourth elements which are disputed by Petitioner. Petitioner argues the Court of Appeal "engage[d] in its own speculation" when it found Petitioner used force or fear to retain the phone and hat. (Doc. 17 at 33.) Petitioner's argument is unavailing given the evidence in the record.

The force or fear needed to commit a robbery does not have to occur only at the time of the taking. *People v. McKinnon*, 52 Cal. 4th 610, 686 (2011). The force or fear used to retain the property also qualifies. *People v. Gomez*, 43 Cal.4th 249, 256 (2008). Consequently, a theft becomes a robbery "if [a] perpetrator, having gained possession of the property without use of force or fear, resorts to force or fear while carrying away the loot." *Id*. at 257.

The "force" required "is such force as is actually sufficient to overcome the victim's resistance. . . ." *People v. Anderson*, 51 Cal. 4th 989, 995 (2009). However, it must be more than the force that is "necessary to accomplish the mere seizing of the property." *Id*. For "fear," an express threat is not required; mere intimidation is sufficient. *People v. Morehead*, 191 Cal. App. 4th 765, 775 (2011). "So long as the perpetrator uses the victim's fear to accomplish the retention of the property, it makes no difference whether the fear is generated by the perpetrator's specific words or actions designed to frighten, or by circumstances surrounding the taking itself." *Flynn*, 77 Cal. App. 4th at 772.

Here, Petitioner and his co-defendants shouted gang slogans and made gang hand signals at Gerardo and his friends. Petitioner's group harassed and intimidated Gerardo and his three friends who were younger and smaller—throughout the night. When Gerardo's group tried to leave the parking lot in their car, Petitioner's group, composed of six men surrounded the car and continued to harass and intimidate Gerardo's group.

29

Co-defendant Toscano challenged Gerardo to fight, which Gerardo refused. Toscano continued to pressure Gerardo to fight, and the Petitioner and his co-defendants encouraged the behavior. When the driver of the car attempted to back his car up, Petitioner's group blocked his path.

After harassing Gerardo's group and pressuring Gerardo to fight, Petitioner called Gerardo "a bitch," and grabbed Gerardo's phone from his lap. Gerardo begged for his phone back, but Toscano stated he would only get it back if Gerardo fought Petitioner. Petitioner then took Gerardo's hat off his head. As Gerardo tried to shut the car door and leave, Toscano shot him.

Considering these facts, force was used to take and retain the property. Petitioner said "[g]ive me your fucking phone," before grabbing Gerardo's phone off his lap. Petitioner also used force to retain both the phone and the hat. Petitioner's group intimidated and harassed Gerardo and ultimately challenged him to a fight to get his property back. The evidence also reveals that Petitioner used fear to take and retain Gerardo's property. The group surrounded the car, and taunted and challenged Gerardo.

The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence to support the robbery conviction and robbery special circumstance.

### C. Substantive Gang Findings and Gang Special Enhancements

In Petitioner's second insufficient evidence claim, he contends there was insufficient evidence to support the jury's finding of guilt on the substantive gang crimes and true findings on the gang special circumstance allegations and the gang enhancements. (Doc. 17 at 43-45.) Petitioner alleges the prosecutor "failed to offer evidence which specified exactly who, when,

where, and under [what] circumstances gang crimes were committed," and presented insufficient evidence to prove the "primary activities" element of the statutory definition of a criminal street gang. *Id.* at 44.

Petitioner was alleged to be a member of the Loma Bakers gang and convicted of being an active participant in a criminal street gang (Cal. Penal Code § 186.22(a)). Further, the jury found true the allegation that the murder was committed while Petitioner was an active member of the gang (Cal. Penal Code § 190.2(a)(22)). As to the murder, robbery, and shooting into an occupied vehicle counts, the jury found true the allegations that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang (Cal. Penal Code § 186.22(b)(1)).

Pursuant to California Penal Code § 186.22(f), "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated . . . ." As the Court of Appeal stated, to establish a group is a "criminal street gang," one element the prosecutor must prove is that the group's "primary activities" is the commission of enumerated crimes. *See* Cal. Penal Code § 187.22(e). Petitioner alleges there was insufficient evidence to establish the "primary activities" element of the definition for a criminal street gang.

### 1. **State Court of Appeal Opinion**

The Court of Appeal denied Petitioner's claim that there was insufficient evidence to establish the primary activities of the Loma Bakers gang:

> Aguero and [Petitioner] challenge the sufficiency of the evidence to support the gang-related special allegations and substantive gang offense on the ground the prosecution presented insufficient evidence to prove the "primary activities" (§ 186.22, subd. (f)) element of the statutory definition of a criminal street gang because, throughout his testimony, the prosecution's gang expert, Deputy Hudson, primarily used the phase *primary criminal activities* rather than *primary activities* in describing the activities of the Loma Bakers gang. . . .
>
> To establish that a group is a "criminal street gang" within the meaning of the relevant statute, the prosecution must prove, among other elements, that one of the

31

group's primary activities is the commission of one or more offenses listed in section 186.22. subdivision (e), and that the group's members engage in, or have engaged in, a pattern of criminal gang activity. (§ 186.22, subd. (f); *People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.)

The term "'primary activities' . . . implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [ ] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Sufficient proof of these "primary activities [may] consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute," or testimony from a police gang expert, who bases his or her opinion on conversations with gang members, personal investigations of crimes committed by gang members, and information from law enforcement colleagues. (*Id*. at p. 324, italics omitted.) We may consider both past and currently charged offenses as part of the gang's "'primary activities.'" (*Id*. at p. 323.)

Aguero and [Petitioner] do not dispute that the jury instructions given in this case correctly defined a "criminal street gang" pursuant to CALCRIM No. 736, in relevant part, as a group having "as one or more of its primary activities, the commission of Murder, Assault with a Deadly Weapon, Narcotics Trafficking, and Possession of Firearm by a Felon. . . ." Nor do they dispute that there was sufficient evidence to show they were active members of a group known as the Loma Bakers or otherwise challenge any of the other elements of the relevant gang statute.

Instead, as mentioned above, Aguero and [Petitioner] contend the prosecution presented insufficient evidence the Loma Bakers gang had, as one or more of its primary activities, the commission of the qualifying offenses listed in the jury instruction based on Hudson's use of the phrase *primary criminal activities* in his testimony instead of *primary activities*. Aguero thus asserts "[t]he jury could not infer that the primary criminal activities were also the primary activities without committing the logical fallacy of composition, assuming that what was true for the part (criminal activities) was also true for the whole (all activities)."

This argument fails because the jury was not required to commit any logical fallacies in order to find that the commission of crimes Hudson described (and listed in his accompanying PowerPoint presentation) as constituting the Loma Bakers "primary criminal activities" also constituted the gang's "primary activities" because the prosecutor pointedly elicited testimony from the gang expert confirming this to be the case and adding, "[the Loma Bakers] have been consistent that way since I've been in law enforcement here."

Moreover, we see little support in the record for Aguero's assertion that the "noncriminal activities" of the Loma Bakers might "predominate, so that commission of a particular crime would not be a primary activity even though, when only the organization's criminal activities are taken into account, it is a

primary activity within the subset." Hudson's testimony describing how the Loma Bakers benefitted from the commission of crimes he listed as their "primary criminal activities" actually helped to illustrate the fundamentally *criminal* purpose of the group and to show how the crimes it committed were not only primary activities of the group but necessary to its existence. For example, Hudson testified that one of the gang's primary criminal activities was the sale of controlled substances, explaining that, because most gang or relatives, and relied on illegal drug sales to raise money to purchase "whatever they may need to commit their next crime."

Aguero's argument on appeal, ironically, relies heavily on Hudson's testimony that Loma Baker gang members commonly congregated and spent their days hanging out at Jefferson Park as evidence the gang functioned as a social association "quite apart from any criminal purpose." This reliance ignores or overlooks earlier testimony by the gang expert indicating it was largely the gang members' involvement in criminal activity which influenced their selection of Jefferson Park as a meeting place in the first place, specifically because of the opportunities the park provided to evade apprehension by law enforcement officers. Hudson thus explained that "there's large areas that are hilly, so it's very difficult to catch people in that park" and "very easy to get away and evade law enforcement."

Aguero further claims that Hudson's opinion regarding the Loma Bakers' primary activities lacked adequate foundation because the expert's testimony revealed it was based on an incorrect legal conclusion entitled to no weight. Thus, he asserts that "the expert made it clear that in his opinion a crime qualified as a primary criminal activity of the gang even if, to his knowledge, there was only a single instance of commission of that crime" and "[o]f course this is flatly contrary to the Supreme Court's admonition that a primary activity must be one of the 'chief' or 'principal' activities of the gang, not an 'occasional,' activity, must less a one-time episode."

Assuming Aguero did not forfeit his foundational challenge by failing to raise it below, we reject it on the merits. As a general matter, we note that Aguero's arguments challenging the foundation of Hudson's opinions are based on isolated statements taken out of context from his cross-examination testimony. When read in context with the expert's testimony as a whole, we conclude these statements do not support his arguments.

Contrary to Aguero's assertions, Hudson's cross-examination testimony did not demonstrate Hudson erroneously believed a single commission of murder by a Loma Baker gang member would suffice to establish the commission of murder was a primary activity of the gang. [FN7] In his testimony and PowerPoint "slide" addressing the Loma Bakers primary activities, Hudson referred to the commission of crimes in the *plural*; i.e. "murders, robberies, assault with deadly weapons, sales of controlled substances," and "illegal weapons possessions." The expert's testimony further established that the opinions he rendered in this case were based not only on the "hundreds" of gang-related investigations he had personally been involved in, but also on his extensive training and conversations with other officers

and actual gang members. Therefore, a reasonable interpretation of the cross-examination testimony cited by Aguero is not that the expert believed his knowledge of a single murder committed by a Loma Baker gang member would be sufficient by itself to satisfy the primary activities element of the gang statute, but rather that, even if he was personally aware of only one such murder, he would still consist murder to be a primary activity of the gang based, not on his personal knowledge of one murder, but on his training and all the other sources of information he properly reviewed and relied on in rendering his expert opinions in this case.

> FN7 Aguero specifically relies on this exchange during Hudson's cross examination by Garcia-Santos's trial attorney: "Q. Do you use the number of the types of crimes in determining whether or not it's a primary criminal activity? [¶] A. The number – [¶] Q. The number of that certain crime committed. [¶] A. Okay. I don't specifically. I just use crimes that I'm aware of myself. [¶] Q. Okay. So let's say, for example, you're aware of one crime, a certain crime. Let's say, for example, you're aware of one murder committed by the Loma Bakers. [¶] A. Okay. [¶] Q. With one murder committed by the Loma Bakers. [¶] A. consider that to be a primary criminal activity? [¶] A. With one murder? [¶] Q. Yes. [¶] A. I could still consider it being a primary criminal activity. I'm aware of it."

We have likewise reviewed and reject similar arguments Aguero raises challenging the adequacy of the gang expert's opinion based on isolated statements taken out of context from his lengthy testimony. We conclude the evidence in this case was more than sufficient to sustain the primary activities element of the statutory definition of a criminal street gang and we do not find any of Aguero's or [Petitioner's] contrary arguments to be persuasive.

(Lodged Doc. 13 at 22-27.)

### 2. Denial of Petitioner's Insufficient Evidence of Gang Activity Claim Was Not Objectively Unreasonable

Petitioner argues the prosecutor did not present sufficient evidence to prove the "primary activities" element for the definition of a criminal street gang. Pursuant to California Penal Code § 186.22(f), a requirement for a criminal street gang is that the group must have, as one of its primary activities, one or more of the crimes specified in subdivision (e). "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony." *People v. Sengpadychith*, 26 Cal.4th 316, 324 (2001).

34

The California Supreme Court has found that an expert witness's opinion, based on conversations with gang members, personal investigation of crimes committed by gang members, and information from colleagues, is sufficient evidence of the "primary activity" element to proving an association was a "criminal street gang." *People v. Gardeley*, 14 Cal. 4th 605, 620 (1996).

Here, Hudson, the gang expert, testified that the primary activities of Loma Bakers gang members included "murders, robberies, assault with deadly weapons, sales of controlled substances, methamphetamine, heroin, cocaine, marijuana. They're also going to include weapons and other violations." (Reporter's Transcript 24 at 4377.) The prosecutor asked, "the primary criminal activities that you listed, murder, robbery, narcotic sales, those crimes, were those the primary activities of the Loma Bakers gang members in 2011?" *Id*. at 4380. Hudson responded, "Yes, ma'am, they have been consistent that way since I've been in law enforcement here." *Id*. After the prosecutor asked, "From August 1st of 2010 through May 15th of 2011, in your opinion, . . . was the gang involved in primary criminal activities that you mentioned?"; Hudson again confirmed that they were involved in those primary activities. *Id*. at 4489.

Petitioner contends the testimony provided by Hudson was not sufficient to prove the "primary activities" of the gang. (Doc. 17 at 44-45.) Petitioner primarily relies on *In re Leland D.*, where the Court of Appeal held that "'expert testimony' based on nonspecific hearsay and arrest information does not constitute substantial evidence that the [group is] a criminal street gang." 223 Cal. App. 3d 251, 259 (1990). *Leland* is distinguishable from the case at bar.

Here, Hudson testified he is a deputy in the Kern County Sheriff's Department, where he had been assigned to the gang unit for six years at the time he testified. (Reporter's Transcript 24 at 4345-46.) He testified he knows of the activities of the Loma Bakers gang based on "[n]umerous investigations. I've testified against them. I've had numerous contacts with them. I've been at the scene of crimes involving them. I've made numerous arrests of Loma Baker gang members." *Id*.

at 4367.  Hudson further testified that he has read reports concerning the Loma Bakers, and spoke with other people in the sheriff's department and rival gang members and non-rival gang members about the Loma Bakers.  *Id*. at 4367-68.  Hudson's knowledge is based on far more than the "nonspecific hearsay and arrest information" that the Court of Appeal found did not constitute substantial evidence in *Leland*.

In addition to Hudson's testimony about the primary activities of the Loma Bakers gang, Petitioner's gang expert, Hunter, testified about the gang.  Hunter testified that he had known the Loma Bakers gang since the 1980's, and had interviewed members, listened to testimony, and reviewed police reports, probation reports, court transcripts, and other documents about them.  (Reporter's Transcript 26 at 4864.)  Hunter testified that "[a]t the present time it is my opinion that [the Loma Bakers gang is] a criminal street gang."  *Id*. at 4866.  Based on Hunter's testimony that the Loma Bakers gang is a "criminal street gang," the "primary activities" of the gang are the ones enumerated in § 186.22(e).

Considering the foregoing, there was sufficient evidence of the Loma Bakers' "primary activities" to sustain the substantive gang crimes and true findings on the gang special circumstance allegations and the gang enhancements.  The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.  For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence to support the gang convictions.

### D.  First Degree Murder

In his third insufficient evidence claim, Petitioner contends there was insufficient evidence to support his first degree murder conviction.  (Doc. 17 at 45.)  Petitioner claims the evidence was insufficient to show that he was guilty of first degree murder under a felony murder theory, aiding

or abetting theory, or natural and probable consequences theory. *Id*. at 45-47.

### 1. <u>State Court of Appeal Opinion</u>

The Court of Appeal found Petitioner's claim that there was insufficient evidence to support the first degree murder charge was unavailing:

> Aguero and [Petitioner] both contend there was insufficient evidence to support their convictions of premeditated first degree murder. . . . Although Aguero and [Petitioner] challenge the sufficiency of the evidence to support their murder convictions on the various theories presented to the jury, we need only address the sufficiently of the evidence to support their convictions under one of those theories. . . . [T]he jury's findings on the gang special circumstance (§ 190.22, subd. (a)(2)) make clear the jury found appellants . . . and [Petitioner] guilty of first degree premeditated murder under a theory of direct aiding and abetting. Substantial evidence supports appellants' convictions under this theory.

> "Aiders and abettors may . . . be convicted of first degree premeditated murder based on direct aiding and abetting principles. [ ] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu*, *supra*, 59 Cal.4th at pp. 166-167.) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Id*. at p. 167.)

> Notwithstanding Aguero's and [Petitioner's] contrary arguments, which are based on selective readings of the record, we conclude the evidence was more than sufficient to show that they and Garcia-Santos knowingly and intentionally assisted Toscano's commission of premeditated murder. The circumstances surrounding the shooting, combined with the gang expert's testimony, gave rise to a reasonable inference that appellants, acting as a group, purposefully set out together to the location of the quinceañera, and pretended to be members of the rival Westside Bakers gang, with the intent of finding and killing a member of the rival gang in retaliation for the shooting of Toscano's brother just six days earlier. As reflected by the gang expert's testimony regarding the hypothetical based on the underlying incident, there was evidence showing appellants acted as a group throughout the incident, including by coming back to surround or at least remaining in close proximity to the car when Toscano went back to shoot [Gerardo]. The gang expert's testimony and [other] testimony also supported a reasonable inference that the other appellants knew Toscano was armed, and knew what he was deliberating and intending to do when he returned to the car, opened the door, and shot Gerardo, and that they intended to back him up in his commission of the murder.

(Lodged Doc. 13 at 21-22.)

37

2. **Denial of Petitioner's Insufficient Evidence of First Degree Murder Claim Was Not Objectively Unreasonable**

Petitioner states the evidence adduced at trial was insufficient to prove he was guilty of first degree murder under a felony murder theory, aiding and abetting theory, or natural and probable consequences theory. (Doc. 17 at 45-47.)

The Court of Appeal found there was sufficient evidence to convict Petitioner under an aider and abettor theory. However, Petitioner maintains "there was no evidence [he] knew that co-[defendant] Toscano intended to commit murder. The text messages which the prosecutor relied on as evidence of premeditation were not directed to [Petitioner], and there is no evidence he knew about them." *Id*. at 46. Instead, the Court of Appeal "impute[d] knowledge of Toscano's mens rea to [Petitioner] based solely upon gang membership, but this is legal error." *Id*.

An individual is guilty of first degree murder under an aiding and abetting theory,

> if the person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating, or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.

*People v. Cooper*, 53 Cal. 3d 1158, 1164 (1991) (citing *People v. Beeman*, 35 Cal. 3d 547, 561(1984)). "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." *In re Lynette G.*, 54 Cal. App. 3d 1087, 1094 (1976).

Petitioner specifically contends that in affirming Petitioner's conviction for first degree murder, the Court of Appeal improperly relied on "the gang expert's testimony that, in gang culture, gangs operate in groups to retaliate against rivals." (Doc. 17 at 45.) Petitioner cites *People v. Killebrew*, for the proposition that the gang expert cannot offer evidence on Petitioner's mental state. *Id*. at 45-46 (*People v. Killebrew*, 103 Cal. App. 4th 644, 658 (2002)). Petitioner states that "[w]hile the evidence of gang culture was admissible, [Petitioner] had to be convicted of first degree

38

murder based upon evidence that he personally had the intent to kill [Gerardo]," which the prosecution did not prove. *Id*. at 46.

In *Killebrew*, the Court of Appeal held that a gang expert may not testify "that a specific individual had specific knowledge or possessed a specific intent." 103 Cal. App. at 658. However, "[i]t would be incorrect to read *Killebrew* as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons. . . . [T]he use of hypothetical questions is proper." *People v. Vang*, 52 Cal. 4th 1038, 1047 (2011) (citing *People v. Gonzalez*, 126 Cal. App. 4th 1539, 1551 n. 4 (2005)) (emphasis omitted).

Petitioner appears to take issue with the Court of Appeal's statements that, "[a]s reflected by the gang expert's testimony regarding the hypothetical based on the underlying incident, there was evidence showing appellants acted as a group throughout the incident . . . .,;" as well as,

> [t]he gang expert's testimony . . . also supported a reasonable inference that the other appellants knew Toscano was armed, and knew what he was deliberating and intending to do when he returned to the car, opened the door, and shot Gerardo, and that they intended to back him up in his commission of the murder.

(Lodged Doc. 13 at 22.)

Contrary to Petitioner's contentions, the record shows that the prosecutor posed hypothetical questions based on Gerardo's shooting that Hudson, the gang expert, answered. For instance, when the prosecutor asked Hudson, "What's expected of a gang member when a fellow gang member is involved in a verbal confrontation?" Hudson answered,

> [I]f one gang member is involved in a verbal confrontation, you'll see the other gang members position themselves generally in a position where they can and if the altercation becomes physical, and commonly you'll see them in the background also reiterating things that are said by the primary offender.

(Reporter's Transcript 24 at 4434-35.) Therefore, the prosecutor questioned Hudson using hypotheticals, which is proper in California.

39

Further, the Court of Appeal did not base its opinion solely on Hudson's opinion, but on the circumstances surrounding the shooting and testimony of other witnesses. (Lodged Doc. 13 at 22.) Text messages between members of the gang showed their intent to retaliate for the shooting of Jacob, co-defendant Toscano's brother, which occurred six days before Gerardo was killed. Albarran[11] and a Loma Bakers gang member, Sicko, texted:

Albarran: "You heard what happened to Lil J?"[12]

Sicko: "Yea I did. I wanna get them fools who did it, dog. You down or what?"

Albarran: Hell, yeah, I'm down. I don't know who. Lil E[13] told me they were Weaksiders."

(Reporter's Transcript 23 at 4256-57.)

In a later conversation between the two,

Sicko: "What did Lil E say? Are we gonna get them foos or what?"

Albarran: "Kosher said yea."[14]

Sicko: "Cool. I'm ready whenever"

Albarran: "That's right, G."

*Id*. at 4258

In a text message exchange between co-defendant Garcia-Santos and his girlfriend on the day of the murder, Garcia-Santos told his girlfriend he could not attend an event with her because, "I got things to handle to by tonight." *Id*. at 4239. Later, when his girlfriend asked if he was ok, Garcia-Santos replied, "Yeah, but we're going to the west side in a bit." *Id*. at 4239-40. At 6:00 p.m., Garcia-Santos texted Jacob that he was with Joseph Gonzales, a Loma Bakers gang member,

---

[11] Albarran was originally named as a defendant, but entered a plea of no contest prior to Petitioner's trial. (Lodged Doc. 13 at 2.)

[12] "Lil J" refers to Jacob Toscano, brother of Petitioner's co-defendant Toscano. As described fully in section I, *supra*, Jacob was shot on April 24, 2011.

[13] "Lil E" refers to co-defendant Toscano.

[14] "Kosher" is an older Loma Bakers gang member. (Reporter's Transcript 24 at 4486.)

Albarran, and co-defendant Aguero. *Id*. at 4242. At 8:16 p.m., when he was at the restaurant where the quinceañera was being held, Garcia-Santos texted his girlfriend that he did not know what time he would be home and "We're waiting." *Id*. at 4243. Gerardo was killed at 9:03 p.m. *Id*.

Based on these test messages, it would be reasonable to conclude that Petitioner and his co-defendants went to the quinceañera to retaliate for the shooting of Jacob. When they arrived at the quinceañera, Petitioner's group tried to identify members of their rival gang, the Westside gang, by pretending to be Westside gang members. One of the co-defendants, believed to be Toscano, asked a quinceañera attendee where the "Westies" were. The attendee pointed to the table where Gerardo and his friends were sitting, even though he was not sure that they were Westside gang members. Petitioner's group acted together to find potential victims.

Before the shooting and while the co-defendants were standing in a circle near each other, Toscano lifted his shirt to show Melina, the woman who had invited him to the quinceañera, a gun tucked into the waist band of his shorts. Therefore, it was reasonable to infer that all the co-defendants knew that Toscano was carrying a gun.

Once Gerardo and his friends walked to their car, Petitioner's group followed them. Toscano's hand was underneath his sweatshirt as he followed Gerardo. When Petitioner's group surrounded Gerardo's car, as a group, they continued to pretend they were part of the Westside gang. When Gerardo told Petitioner's group, "I'm from the West Side, too," Petitioner responded, "You not from my hood." At that point, Petitioner's group began to harass and intimidate Gerardo and, as a group, blocked the car so that Gerardo could not get away from them. Petitioner stole Gerardo's phone and hat and the co-defendants taunted Gerardo and his friends, calling them "little bitches."

//

//

41

Hudson also testified that a gang would retaliate if one of their gang members was shot, with an equal or greater use of violence. (Reporter's Transcript 24 at 4430-32.) He also testified that the retaliation would be led by a family member who was also in the gang. *Id.* at 4432-33. Here, after Jacob was shot, his brother, co-defendant Toscano, brought his gun to the quinceañera and killed Gerardo.

It appears, based on this evidence, that the co-defendants acted together to find a victim, knowing that they wanted to seek revenge for Jacob's death and knowing that Toscano was carrying a gun, and while harassing and taunting Gerardo, encouraged the crimes of robbery and then shooting Gerardo. In view of these facts, it was reasonable for the Court of Appeal to find that Petitioner knew of Toscano's unlawful purpose, and intended to commit, facilitate, or encourage the commission of the crime by acting, aiding, promoting, encouraging, or instigating the commission of the crime.

Therefore, the Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence to support the robbery conviction and robbery special circumstance.

## VII. The State Court Did Not Err in Allowing the Introduction of Text Message Evidence

In his fifth ground for habeas relief, Petitioner contends the trial court improperly admitted text messages, after finding they qualified as admissions of co-conspirators. (Doc. 17 at 35-38.) Respondent counters the claim is not cognizable on federal habeas review, because Petitioner is asserting a violation of state law. (Doc. 23 at 52-60.)

## A. Text Messages Between Members of the Loma Bakers Gang

Petitioner argues that text messages exchanged between members of the Loma Bakers gang should not have been admitted as proof of a conspiracy, because there was no evidence that Petitioner was a member of the conspiracy when the messages were created. (Doc. 17 at 35.)

### 1. State Court of Appeal Opinion

The Court of Appeal rejected Petitioner's claim that the trial court erred in admitting text messages exchanged between members of the Loma Bakers gang.

[Petitioner] contends that the trial court erred in admitting evidence of certain text message exchanges between codefendant Albarran and another Loma Baker gang member known as "Sicko" as statements of a coconspirator under Evidence Code section 1232.[15] . . .

Regarding Albarran's text message exchanges with Sicko, [Petitioner] complains the trial court erred in overruling his objections to the following two exchanges and finding them admissible as statements of a coconspirator.

The first exchange occurred on April 24, 2011, around 5:00 p.m.:

| | |
|---|---|
| Albarran: | "u herd what happen 2 lil j?"[16] |
| Sicko: | "Yea I did I wana get them foos who did it dawg, u down or what?" |
| Albarran: | Hell yeah I'm down.  I don't know who.  lil e [Toscano] told me they were weeksiders. |
| Sicko: | "I heard that same thing."  (Some punctuation added.) |

The second exchange occurred the same day around 6:00 p.m.:

| | |
|---|---|
| Sicko: | "Where did j get shot at?" |
| Albarran: | "Like w[h]ere i[n] the st[reet] or w[h]ere on his body? |

---

[15] The Court of Appeal opinion appears to contain an error as California Evidence Code 1232 does not exist, but California Evidence Code 1223 states:

Evidence of a statement offered against a party is not inadmissible by the hearsay rule if:

(a)  The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy.

[16] "lil j" refers to Jacob Toscano, brother of Petitioner's co-defendant Toscano.  .

| | | |
|---|---|---|
| Sicko: | "The spot where at.? | |
| Albarran: | "by jumbugs pad on [K]notts." | |
| Sicko: | "Is that right im pretty sure it had something to do with those niggers." | |
| Albarran: | "I don't think they live there kus I haven't been seeing them." | |
| Sicko: | "what did lil e say r we gona get them foos or what?" | |
| Albarran: | "Kosher sead yea." | |
| Sicko: | "Koo im ready wenever." | |
| Albarran: | "That's right g."  (Some punctuation added.) | |

. . .

Regarding the first set of text messages between Albarran and Sicko, Petitioner contends the trial court erred in finding them admissible against him as statements of coconspirators because there was insufficient evidence that he ([Petitioner]) participated in a conspiracy to commit murder.  We need not reach the merits of this contention because assuming, *arguendo*, the trial court erred admitting the evidence of the text messages, [Petitioner] cannot establish prejudice under the applicable *Watson*[FN8] standard or the *Chapman* [FN9] standard he claims should apply.  The text exchange was cumulative of the properly admitted evidence showing that Toscano held Westsiders responsible for the shooting that injured his brother Jacob and that appellants planned and committed the offenses in retaliation for the shooting.

FN8 *People v. Watson* (1956) 46 Cal.2d 818, 836.[17]
FN9 *Chapman v. California* (1967) 386 U.S. 18, 24.[18]

(Lodged Doc. 13 at 30-32.)

---

[17] The California Supreme Court held "that a 'miscarriage of justice' should be declared only when the court, . . . is of the 'opinion' that it is reasonably probable that a result  more favorable to the appealing party would have been reached in the absence of error."  *People v. Watson*, 46 Cal. 2d 818, 836 (1956).
[18] In *Chapman*, the United States Supreme Court determined that "admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, . . ., be conceived of as harmless."  *Chapman v. Cal.*, 386 U.S. 19, at 24-25 (1967).

44

## 2. **Admission of the Text Messages Between Loma Bakers Gang Members Did Not Violate Petitioner's Due Process Rights**

Issues regarding the admission of evidence are matters of state law, generally outside the purview of a federal habeas court. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995). "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983).

"Although the [U.S. Supreme] Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375 . . ., it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101. Therefore, the Court of Appeal could not have contravened federal law through the admission of the text message evidence when federal law is not clearly established. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ([T]his Court has held on numerous occasions that it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.").

Here, the Court of Appeal did not reach the merits of whether the text messages were admissible, but found that any error in admitting them was harmless. Under federal habeas review, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776). When a state court finds harmless error, this Court must determine whether the finding was objectively unreasonable. *Davis v. Ayala*, 135 S.Ct. 2187, 2198 (2015). The Court will apply the *Brecht* test, but will do so "with due consideration of the state court's reasons for concluding that the error was harmless beyond a

reasonable doubt." *Garcia v. Long*, 808 F.3d 771, 782 (2015).

The Court of Appeal found the "text exchange was cumulative of other properly admitted evidence showing that Toscano held Westsiders responsible for the shooting that injured his brother and that" Petitioner and his co-defendants "planned and committed the offenses in retaliation for the shooting." (Lodged Doc. 13 at 32.) Petitioner maintains the text messages were prejudicial because they "were the basis for an uncharged conspiracy instruction," and "[w]ithout the uncharged conspiracy instruction, the jury likely would not have convicted [Petitioner] of murder since there was no evidence [Petitioner] had any warning of co-appellant Toscano's decision to shoot at [Gerardo]." (Doc. 17 at 35.)

Petitioner's argument is unavailing. As the Court has already explained, there was sufficient evidence to convict Petitioner of first degree murder under an aiding and abetting theory based on the text messages, as well as his actions on the night of the shooting. Because the evidence presented at trial *without* the text messages was sufficient to convict Petitioner of first degree murder under an aiding and abetting theory, Petitioner has not shown that the admission of the text messages had a "substantial and injurious effect" on the verdict. Consequently, the Court recommends denying this claim.

## B. Admission of Text Messages Between Co-Defendant Garcia-Santos and His Girlfriend

Petitioner additionally alleges that the trial court erred in admitting text messages between co-defendant Garcia-Santos and his girlfriend as declarations against penal interest, because they violated his right to a fair trial. (Doc. 17 at 2728.) Specifically, Petitioner argues the text messages were ambiguous because the term "we" was used in them, but not defined, and they were untrustworthy. *Id*. at 37-38.

## 1. **State Court of Appeal Opinion**

The Court of Appeal rejected Petitioner's argument that it was improper to admit text messages between Garcia-Santos and his girlfriend:

> [Petitioner] contends that the trial court erred in admitting evidence of certain text message[s] . . . between [co-defendant] Garcia-Santos and his girlfriend "Viri" as declarations against penal interest under Evidence Code section 1230.[19]
>
> . . .
>
> Regarding evidence of text messages exchanged between Garcia-Santos and Viri, the first one he challenges concerned a car wash held to raise money for Toscano after he had been arrested for Gerardo's murder. In his text, Garcia-Santos wrote: "No [the car wash is] for the homie th[ ]at got locked up lil E he was with us when we did that."
>
> The second text exchange [Petitioner] challenges took place several days after Toscano's arrest. Viri asked Garcia-Santos why it took him so long to text her back, to which he responded: "Cause we[']re all talking about our [alibis]."
>
> . . .
>
> With respect to the second set of text messages at issue, between Garcia-Santos and Viri, [Petitioner] argues the trial court erred in admitting them under the hearsay exception for statements against penal interest because they were ambiguous and therefore untrustworthy. A reviewing court may overturn the trial court's determination only if that discretion was abused. (*People v. Frierson* (1991) 53 Cal.3d 730, 745.) The court here did not abuse its discretion in finding that Garcia-Santos's statements to his girlfriend were sufficiently trustworthy for purposes of admitting them as statements against penal interest.
>
> Garcia-Santos's use of the personal pronouns "us," "we," and "our" in his text messages, without specifically identifying the persons to whom he was referring, did not render his statements too ambiguous to be trustworthy for purposes of the hearsay exception at issue under any authority [Petitioner] cites or of which we are aware. Presumably, Garcia-Santos and Viri knew to who Garcia-Santos was referring and his statements would not have been ambiguous to them. Moreover, they were specific enough to indicate Garcia-Santos was involved in the underlying shooting incident for which Toscano had been, in Garcia-Santos's words, "locked up." Whether Garcia-Santos's self-implicating statements were, in fact, referring

---

[19] Pursuant to California Evidence Code 1230,

> Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.

to the shooting incident or the other appellants was a question for the jury to decide; however, there was certainly enough circumstantial evidence for the jury to answer that question in the affirmative. It was not an abuse of discretion, therefore, for the trial court to conclude that Garcia-Santos's text messages were not too ambiguous but sufficiently trustworthy for purposes of admitting them as declarations against penal interest.

Lodged Doc. 13 at 31-33.

### 2. Admission of the Text Messages Between Co-Defendant Garcia-Santos and His Girlfriend Did Not Violate Petitioner's Due Process Rights

Issues regarding the admission of evidence are matters of state law, generally outside the purview of a federal habeas court. *Holley*, 568 F.3d at 1101. "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson*, 63 F.3d at 930. "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. at 438 n. 6.

"Although the [U.S. Supreme] Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375 . . ., it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101. Therefore, the Court of Appeal could not have contravened federal law through the admission of the text message evidence when federal law is not clearly established. *Knowles*, 556 U.S. at 122 ([T]his Court has held on numerous occasions that it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.").

Petitioner also contends, "[a]lthough these statements did not qualify as testimonial hearsay under *Crawford v. Washington*['s] . . . Sixth Amendment Analysis, nevertheless as part of [Petitioner's] basic right to a fair trial, these should not have been admitted because they were not

trustworthy." (Doc. 17 at 37-38) (internal citation omitted). The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him." The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

The Supreme Court has also interpreted the Confrontation Clause to permit admission of out-of-court statements by an unavailable witness, if the statements bore "adequate indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception," or there is a showing of "particularized guarantees of trustworthiness." *Id.*

Here, the Court of Appeal's determination that the statements were trustworthy was not unreasonable. Petitioner argues the text messages were not trustworthy because Garcia-Santos wrote, "he was with us when we did that," and "Cause we[']re all talking about our [alibis]," but did not identify who he was referring to when he wrote "we." (Lodged Doc. 13 at 31.) Petitioner does not explain why the text messages are not trustworthy because the "we" was not identified. Nor does Petitioner cite any federal cases involving the Confrontation Clause. *See Jones v. Gomez*, 66 F.3d 199, 204 (1995) ("It is well-settled that conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.") (internal quotation marks and alteration omitted).

In any event, admission of the text messages did not render Petitioner's trial fundamentally unfair. As with the text messages between the Loma Bakers gang members, the text messages between Garcia-Santos and his girlfriend were cumulative of other evidence adduced at trial. The text messages showed that Toscano was present when the shooting took place, that Garcia-Santos was with him, and that Garcia-Santos was talking with other people about an alibi. Petitioner has

not shown that the admission of the text messages had a "substantial and injurious effect" on the verdict. Consequently, the Court recommends dismissing this claim.

## VIII.    **Admission of Gang Expert Testimony**

In his sixth ground for habeas relief, Petitioner alleges that Hudson, the gang expert, gave improper testimony that Petitioner must have known co-defendant Toscano had a gun. (Doc. 17 at 38.) Specifically, Petitioner contends Hudson "may not opine that a specific individual has a specific knowledge or possessed a specific intent. *Id.* (citing *People v. Killebrew*, 103 Cal. App. 4th 644, 658 (2002)).[20] Respondent counters there is no clearly established authority from the United States Supreme Court holding that expert testimony on a defendant's subjective intent is unconstitutional. (Doc. 23 at 60-61.)

### A.   **State Court of Appeal Opinion**

The Court of Appeal denied Petitioner's claim that Hudson's testimony was improper:

Garcia[-]Santos and [Petitioner] contend that the trial court erred in permitting the prosecution's gang expert to render, over defense objections, an improper opinion about their subjective knowledge of Toscano's weapon in violation of principles set forth in this court's opinion in *Killebrew*, *supra*, 103 Cal.App.4th at page 657. Hudson testified in relevant part as follows:

"[THE PROSECUTOR:] Q. Do you have any training about whether or not when one person has a firearm, whether the other gang members know about it?

"[HUDSON:]            A. Yes, ma'am.

"Q.    What's that training?

"A.    Training would include the conferences I spoke about earlier when we go to gang conferences, information passed along during meetings. I've also had training directly related to when I've spoken to actual gang members about whether or not they would be aware of other members possessing guns, what would they expect, what would they do in that situation.

---

[20] The Court of Appeal held that a gang expert may not testify "that a specific individual had specific knowledge or possess a specific intent." *Killebrew*, 103 Cal. App. at 658.

50

"Q.   About how many gang members do you think you've talked to about that?

"A.   Dozens.  I couldn't give you an exact number, ma'am but I've talked to – that's one of the primary questions I ask gang members when I speak with them if I can get to that point with talking to them.

"Q.   So that's a pretty important concept.

"A.   To me it is, yes.

"Q.   So you've been trained about that concept and you've talked to gang members about that concept?

"A.   Yes, ma'am.

"Q.   And have you previously testified about that concept?

"A.   Yes ma'am.  [¶] . . . [¶]

"Q.   I'd like you to assume the following: That we have one gang member going with other gang members to commit a crime, so they're traveling together.

"A.   Okay.

"Q.   And one gang member is armed.  Do rules govern as to whether that gang member who is armed has to tell the other that he is armed?

"A.   Yes.

"Q.   Tell us about those rules that govern that type of concept.

"A.   From my contacts with gang members, they would expect to be told about the firearm to know where it is in case of a defensive or offensive is needed, they would be able to acquire that gun if the person that had it was unable to use it.

"Not only further, they would also expect them to tell them because if they get stopped, they need to know about that gun.  Someone in the car might be on parole, might get charged with it.  They're going to discuss that.

"And further, they're going to expect each other to know about it.

"Q.   All right.  So if one person is armed, generally the other gang members are going to know about it.  [¶] . . . [¶]

"A.   Hypothetically.  Generally, yes.  [¶] . . . [¶]

51

"Q.     Would it be considered, sir, hypothetically, of course, disrespectful if the person who is carrying a gun didn't tell the others about it?

"A.     If they were going somewhere together in that situation as I described, yes, it would be considered disrespectful.

"Q.     Why would it be disrespectful?

"A.     Because you could put the other people in the car in a situation without their knowledge of it.

"Q.     And this applies to something – does it apply to more than cars?

"A.     Sure.  It could apply to if they were all going to a specific location together or meeting somewhere, commonly if someone goes somewhere, especially when you're dealing with a gang, usually the – my experience has been that the individuals, even without having to tell them, will know that they have a gun because they've told them in the past because they usually will brag about it.  So everyone's going to know they have a gun in that clique anyways, but they're generally going to tell the people that are in the gang that don't know hey, I've got a gun on me, we're going here.  If something happens, this is where it's at.

"Q.     Is this true in Sureno street gangs?

"A.     Yes, ma'am.

"Q.     And specifically the Loma [Baker gang]?

"A.     Yes ma'am."

The trial court properly admitted this testimony.  "The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates.  [ ] Such evidence is admissible even though it encompasses the ultimate issue in the case." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.)  "Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. [ ] [¶] The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.'"  (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; see also *People v. Olguin*, *supra*, at pp. 1369-1370.)

Garcia-Santos and [Petitioner] contend that, although masked as a hypothetical, Hudson's testimony essentially opined that they each had specific knowledge of Toscano's weapon, as ruled improper in *Killebrew*, *supra*, 103 Cal.App.4th at pages 657-658.  However, in *Killebrew*, this court drew the crucial distinction between

52

permissible expert testimony as to "the expectations of gang members in general when confronted with a specific action" (*id*. at p. 658) and impermissible testimony as to what a defendant was actually thinking during commission of a crime – the expert "testified to the subjective knowledge and intent of each occupant in each vehicle." (*Id*. at p. 658, italics omitted.) The record does not support appellants' position because, in the challenged instances, Hudson was testifying as to the expectations of a typical gang member in various situations as permitted under *Killebrew*. As this court explained: "Testimony that . . . gangs would travel in large groups if expecting trouble, that in a confrontation more than one gang member may share a gun in some identified circumstances, and that oftentimes gang members traveling together may know if one of their group is armed, would have been admissible." (*Killebrew*, *supra*, 103 Cal.App.4th at p. 658.) The same is true of Hudson's testimony in this case.

Lodged Doc. 13 at 27-30.

## B. Admission of the Hudson's Testimony Did Not Violate Petitioner's Due Process Rights

Issues regarding the admission of evidence are matters of state law, generally outside the purview of a federal habeas court. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995). "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983).

"Although the [U.S. Supreme] Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375 . . ., it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101. Therefore, the Court of Appeal could not have contravened federal law through the admission of the text message evidence when federal law is not clearly established. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ([T]his Court has held on numerous occasions that it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to

apply a specific legal rule that has not been squarely established by this Court.").

Petitioner is entitled to habeas relief if the admission of evidence "is so extremely unfair that its admission violates fundamental conceptions of justice." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). A due process violation occurs only if there are no permissible inferences that the jury may draw from the evidence. *Id.* Here, Hudson did not testify to Petitioner's subjective knowledge or intent regarding whether co-defendant Toscano was armed. Instead, he testified about the customs of gang members in general, and whether it would be expected for a gang member to advise other gang members if he were armed. Because there was no due process violation, the Court recommends denying the claim.

## IX. The State Court Did Not Err in Rejecting Petitioner's Equal Protection Claim

In his seventh claim for relief, Petitioner contends the imposition of sentencing enhancements violated his right to equal protection of the law. (Doc. 17 at 40-43.) Specifically, Petitioner alleges California Penal Code §§ 12022.53(d) and (e)[21] denied him "equal protection of the law because they impose drastically greater punishment upon aiders and abettors of street gang crimes than on those who aid and abet other crimes." *Id.* at 40-41. Respondent counters that the Court of Appeal was not objectively unreasonable in rejecting Petitioner's equal protection claim. (Doc. 23 at 67.)

---

[21] Pursuant to California Penal Code § 12022.53(d),

> any person who, in the commission of a felony specified . . ., personally and intentionally discharges a firearm and proximately causes great bodily injury, . . ., to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life.

California Penal Code § 12022.53(e)(1) provides,

> The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:

> (A) The person violated subdivision (b) of Section 186.22.
> (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d).

## A. State Court of Appeal Opinion

The Court of Appeal rejected Petitioner's equal protection claim:

No evidence was presented at trial that any of the appellants other than Toscano shot Gerardo. Nevertheless, the sentence of each was enhanced by a term of 25 years to life in prison pursuant to section 12022.53, subdivisions (d) and (e)(1). FN15 [Petitioner] now contends subdivision (e)(1) of section 12022.53 violates his right to equal protection of the laws by treating aiders and abettors of shootings committed for the benefit of a criminal street gang differently from aiders and abettors of shootings committed in concert by criminal organizations or groups not defined as street gangs. . . . As we shall explain, the courts in *People v. Gonzales* (2001) 87 Cal.App.4th 1 (*Gonzales*) and *People v. Hernandez* (2005) 134 Cal.App.4th 474 (*Hernandez*) have already rejected [Petitioner's] argument, and we find no basis to depart from this established authority. FN16

> FN15 Section 12022.53 provides, in pertinent part: "(d) Notwithstanding any other provision of law, any person who, in the commission of a [specified felony including murder], personally and intentionally discharges a firearm and proximately causes . . . death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life. [¶] (e) [¶] (1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision . . . (d)."

> FN16 This type of challenge to the constitutionality of a statute may be raised for the first time on appeal. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 200; see also *People v. Lord* (1994) 30 Cal.App.4th 1718, 1722, fn. 2.) Accordingly, we reject the People's argument the claim was forfeited by appellants' failure to object in the trial court.

"The constitutional guaranty of equal protection of the laws has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness. [ ] The concept recognizes that persons similarly situated with respect to the legitimate purpose of the law receive like treatment, but it does not, however, require absolute equality. [ ] Accordingly, a state may provide for differences as long as the result does not amount to invidious discrimination." (*People v. Romo* (1975) 14 Cal.3d 189, 196.)

""""The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner."""" (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1427.) "If persons are not similarly situated for purposes of the

law, an equal protection claim fails at the threshold." (*People v. Buffington (1999) 74 Cal.App.4th 1149, 1155.*) The court in *Gonzalez, supra,* 87 Cal.App.4th at page 13 rejected the argument that an aider and abettor of a gang member who discharges a firearm is similarly situated to an aider and abettor of a firearm user who is not a member of a criminal street gang. The court explained that "[u]nlike other aiders and abettors who have encouraged the commission of a target offense resulting in a murder, defendants committed their crime with the purpose of promoting and furthering their street gang in its criminal conduct. . . . [¶] Defendants were not similarly situated with other aiders and abettors, and on that basis, their equal argument fails." (*Ibid.*)

But even if [Petitioner] could show that he was similarly situated with aiders and abettors of nongang members, "'a second level of analysis is required. If the law in question impinges on the exercise of a fundamental right, it is subject to strict scrutiny and will be upheld only if it is necessary to further a compelling state interest. All other legislation satisfies the requirements of equal protection if it bears a rational relationship to a legitimate state purpose.'" (*Gonzalez, supra,* 87 Cal.App.4th at pp. 12-13.) Though [Petitioner] contends aiding and abetting a gang shooting involves the exercise of a fundamental right subject to strict scrutiny, the court in *Hernandez, supra,* 134 Cal.App.4th at page 483 determined that rational basis review was the appropriate test to resolve an equal protection challenge to section 12022.53, subdivision (e)(1). The rational basis test typically applies to an equal protection challenge to a criminal statutory scheme where there is no claim that the classification at issue involves a suspect class or harsher treatment for a juvenile than an adult. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 838 (*Wilkerson*).)

The court in *Hernandez, supra,* 134 Cal.App.4th at page 483, further concluded that the enhancement provided by section 12022.53, subdivision (e)(1) satisfied the rational basis test: "Clearly the Legislature had a rational basis for imposing a 25-years-to-life enhancement on one who aids and abets a gang-related murder in which the perpetrator uses a gun, regardless of the relationship between the aider and abettor and the perpetrator. As we previously observed, the purpose of this enhancement is to reduce through punishment and deterrence 'the serious threats posed to the citizens of California by gang members using firearms.' One way to accomplish this purpose is to punish equally with the perpetrator a person who, acting with knowledge of the perpetrator's criminal purpose, promotes, encourages or assists the perpetrator to commit the murder." (*Hernandez,* at p. 483, fn. omitted.)

Citing *People v. Olivas* (1976) 17 Cal.3d 236 (*Olivas*), [Petitioner] argues that we should not adopt the rational basis test endorsed by *Hernandez, supra,* 134 Cal.App.4th 474. [Petitioner's] argument is contrary to law. In *Wilkinson, supra,* 33 Cal.4th 821, the California Supreme Court held that the statutory scheme governing the offense of battery on a custodial officer did not violate equal protection principles. (*Id.* at pp. 838-841.) In reaching its conclusion, the court rejected the defendant's argument that strict scrutiny was required according to Olivas, a case involving an equal protection challenge to a statute which gave the

trial court discretion to commit a defendant, convicted as an adult and between the ages of 16 and 21, to the California Youth Authority for a longer term than the defendant would have received if he or she had been sentenced as an adult. (See *Wilkinson*, at p. 837.) The scrutiny is required for an equal protection challenge on the grounds a penal statute authorizes different sentences for comparable offense. The court explained that justice systems be rigorously maintained. We do not read *Olivas* as requiring the courts to subject all criminal classifications to strict scrutiny requiring the showing of a compelling state interest therefor.' [ ] Other courts similarly have concluded that a broad reading of *Olivas*, as advocated by defendant here, would 'intrude[ ] too heavily on the police power and the Legislature's prerogative to set criminal justice policy.'" (*Wilkinson*, at pp. 837-838.) Accordingly, the rational basis test applied in *Hernandez* is applicable and results in the conclusion that section 12022.53, subdivision (e)(1) does not violate equal protection principles.

Lodged Doc. At 45-49.

## B. Denial of Petitioner's Equal Protection Claim Was Not Objectively Unreasonable

Petitioner claims California Penal Code § 12022.53(d), which requires the imposition of a consecutive term of twenty-five years to life for any defendant who personally and intentionally discharged a firearm that causes the victim's death, violates his right to equal protection.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Pyler v. Doe*, 457 U.S. 202, 216 (1982)). "If a legislative classification or distinction 'neither burdens a fundamental right nor targets a suspect class, we will uphold [it] so long as it bears a rational relation to some legitimate end.'" *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (quoting *Romer v. Evans*, 517 U.S> 620, 631 (1996)).

"For statutory challenges made on Equal Protection grounds, 'the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a governmental interest.'" *Robinson v. Marshall*, 66 F.3d 249, 251 (9th Cir. 1995) (quoting *United States v. Harding*, 971 F.2d 410, 42 (9th Cir. 1992)). A legislative distinction made for sentencing purposes "must be upheld against [an] equal protection challenge if there is any *reasonably conceivable state of facts* that could provide a rational basis for the

classification." *United States v. Ellsworth*, 456 F.3d 1146, 1150 (9th Cir. 2006) (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993)) (internal quotation marks omitted) (emphasis in original).

Even assuming Petitioner has shown he is subject to different treatment than defendants similarly situated to him under California Penal Code § 12022.53, Petitioner has not satisfied the heavy burden of showing that the statutory distinction lacked a rational basis. As the Court of Appeal observed, California has a legitimate interest in reducing the use of firearms by gang members. *See People v. Garcia*, 28 Cal. 4th 1166, 1172 (2002) (in drafting § 12022.53(e)(1), the California legislature intended to "severely punish aiders and abettors to crimes by a principal armed with a gun committed in furtherance of the purposes of a criminal street gang" and did so "in recognition of the serious threats posed to the citizens of California by gang members using firearms") (quoting *People v. Gonzales*, 87 Cal. App. 4th 1, 19 (2001)).

California could have rationally concluded that the use of firearms by gang members could be reduced by punishing and deterring those who aid and abet murders committed by gang members in which the perpetrator uses a gun. *Hernandez v. Haws*, No. CV 07-2140 CJC (CW), 2011 WL 1898205, at *11 (C.D. Cal. Feb. 9, 2011) (citing *People v. Hernandez*, 134 Cal. App. 4th 474, 483 (2005)).

The Court of Appeal's rejection of Petitioner's Equal Protection Clause claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law; therefore, the Court recommends denying Petitioner's claim.

## X.    Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate

of appealability is 28 U.S.C. § 2253, which provides:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication. Accordingly, the Court recommends declining to issue a certificate of appealability.

XI.     **Conclusion and Recommendation**

Based on the foregoing, the undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   __**August 6, 2018**__              _____/s/ *Sheila K. Oberto*_____
                                                      UNITED STATES MAGISTRATE JUDGE